# Case No. 17,767.

## WILLINGS et al. v. CONSEQUA (three suits).

## CONSEQUA v. WILLINGS et al. (two cases).

### [Pet. C. C. 301.] [1]

Circuit Court, D. Pennsylvania. Oct. Term, 1816.

COMPETENCY OF WITNESS—CONTINGENT INTEREST —JOINT DEBTORS—EFFECT OF JUDGMENT AGAINST ONE—RELEASE—PARTY AS WITNESS—ASSIGNMENT OF INTEREST.

1. K. and another, as the agents of W. and F., gave a note for 22,000 dollars, to C. for merchandize, in which K. was interested. C. brought a suit against W. and F. on the note, stating it to be given by the procurement of their agents K. and another. It was agreed, that whatever damages might be recovered in a suit brought by W. and F. against C. should be set off against the note. It was alleged, that K., as a dormant partner of W. and F., might be used, as such, by C., if the note should not be discharged by a recovery of damages from C., in the suits of W. and F., and if W. and F. should be unable to pay the note; and that he was therefore interested to increase those damages. The interest of K., in the event of the suits between W. and F. and C., is too remote to exclude him from being a witness; the objection is to his credit, and not to his competency.

[Cited in Gant v. Reed, 24 Tex. 49.]

2. When two or more persons are liable for a simple contract debt, a judgment obtained against one, is an extinguishment of the claim on the other debtors, in the same manner, as a bond, given by one of two persons liable on a simple contract, is an extinguishment of the original debt.

[Cited in Ferrall v. Bradford, 2 Fla. 508. Cited in brief in Moffett v. Bowman, 6 Grat. 231. Cited in Brown v. Johnson, 13 Grat. 650, 651; Ward v. Motter, 2 Rob. (Va.) 565.]

3. A release to one of two joint obligors, extinguishes the obligation, and equity will not relieve in such a case, although it is most apparent, the extinguishment was not intended by the parties.

[Cited in Reed v. Shaw, 1 Blackf. 245, note.]

4. The general rule of law is, that a party to a suit, cannot be a witness. This rule is founded on the interest the party has in the suit, and when that interest is removed, the objection ceases to exist.

[Questioned in Levy v. Burley, Case No. 8,-300; Yearsley v. Brookfield, Id. 18,131.]

[Cited in Sinks v. English, 3 Blackf. 138; Preble Co. Bank v. Russell, 1 Ohio St. 318. Cited in brief in Onion v. Fullerton, 19 Vt. 319; Loomis v. Loomis, 26 Vt. 202.]

5. One of the plaintiffs in a suit may be examined as a witness, who had assigned all his interest in the subject in controversy, to his co-plaintiff, after the costs of the suit, as estimated by the clerk of the court, had been deposited with the clerk and an offer made to pay to the clerk any further sum, which he or the counsel for the defendant might require to cover the costs, and a release executed by the remaining plaintiffs, of all claims on him for the costs which had or might accrue, and for any claims for contribution to any sum which the defendant might recover against those who executed the release, and also a covenant, by the remaining plaintiffs, to indemnify him against all costs, charges, and damages which might accrue, in prosecuting the suit.

[Disapproved in Stein v. Bowman, 13 Pet. (38 U. S.) 219; Bridges v. Armour, 5 How. (46 U. S.) 94.]

[Cited in Manchester Bank v. White, 30 N. H. 460; Evans v. Dela, 35 Pa. St. 453; Ward v. Motter, 2 Rob. (Va.) 556.]

6. The clerk of the court, is a competent judge of the quantum of costs which can be recovered in an action; and money paid to him on account of the costs of a suit, is in the safe keeping of the court and subject to its disposal.

7. The court will not look to remote contingencies, in order to disqualify a witness from giving testimony.

8. The testimony of a witness, taken under a commission directed to five persons or any one of them, cannot be read in evidence, if another person than the commissioner, and who was not named in the commission, assisted in taking the examination of the witness.

[Cited in brief in Patterson v. Greenland, 37 Pa. St. 511.]

9. Quere. Whether the principles of the law of evidence, relating to sales made by a broker, as between a vendor and vendee, are applicable to a case between vendee and warrantor.

10. The deposition of a witness, on the part of the plaintiff, who had given certificates upon which a recovery was expected to be obtained, and who expected a commission of one per cent, on the amount to be recovered from the defendant, but which certificates were not evidence in the cause, is admissible.

11. Correspondence, between the parties in a cause and others, called for by notice, but which the party who called for it does not read, cannot be read by the party producing it.

12. In an action for damages for a breach of contract, no evidence of fraud is admissible,

[1] [Reported by Richard Peters, Jr., Esq.]

and if, from evidence given in the course of the cause, the jury should be disposed to infer fraud, they should not permit it to influence their verdict.

[Cited in brief in Born v. Shaw, 29 Pa. St. 290.]

13. The laws and usages of foreign countries where contracts are made and to be executed, and which respect the validity, construction, and performance of those contracts, are regarded here, as rules of decision.

14. In a contract for the sale of articles without warranty, if there be no fraud on the part of the seller, he is not answerable for the quality of the articles.

[Cited in Wetherill v. Neilson, 20 Pa. St. 452.]

15. If the vendor warrants the quality of the articles he sells, he is bound to deliver them of the stipulated quality, and the examination and approbation of some of the articles by the vendee, when they are delivered, does not amount to a waiver of the contract.

16. If the vendee cannot examine the articles, but purchases them from an examination of samples, there is an implied warranty on the part of the seller, that the articles shall correspond with the samples. But, an examination of samples, when there is an express warranty, is not a waiver of the warranty.

[Cited in Borrekins v. Bevan, 3 Rawle, 44.]

17. The custom at Canton by which the sales of teas are regulated.

18. Usage at Canton by which compensation is made to purchasers of teas, which are afterwards found inferior to the quality they were represented to be at the time of sale.

19. It is the usage at Canton, to add interest on the amount of the articles sold, and for which compensation is made, to the other charges.

20. Where an attachment is laid on money in the hands of a third person, interest ceases from the time of the attachment until it is dissolved; but when a debtor, who is also a creditor, lays an attachment in his own hands, interest is chargeable, during the continuance of the attachment.

[Cited in brief in Lyman v. Orr, 26 Vt. 121.]

[21. Cited in Taylor v. Carpenter, Case No. 13.785, to the point that a person from abroad suing in this country is to enjoy no greater nor less rights than citizens.]

These causes, having been tried at the October sessions of the court, in 1815 [Case No. 17,-766], and new trials having been ordered at the last sessions (Consequa v. Willings [Id. 3,128]), again came on for trial. In addition to the evidence given at the former trial, Mr. Kuhn was offered as a witness, and was objected to on the ground of interest, he being one of the plaintiffs in the suit of Willings and Francis and Kuhn, which the jury were charged to try. To get rid of this objection, the plaintiffs produced an assignment executed by the witness, dated a few days past, to Willings and Francis, his co-plaintiffs, of all his part and interest in their claim against the defendant in the suit wherein he is a party, and of whatsoever sum may be recovered in that action, with a power to the assignees, to use his name in the action. They also produced three releases to him, bearing date on the same day with the assignment, one from the Messrs. Willings, and the other from the administrator of Mr. Francis, who

had died since the last trial, from his liability for the costs which had accrued, or might thereafter accrue in the said action, and from all claim for contribution to any sum, which the defendant might recover in his actions against the releasors; the last release was given by Mr. Thomas M. Willings to the witness, from all claims and demands against him, by reason of the aforesaid assignment, or in case the claim against the defendant should not be established or recovered; and from all costs, charges, and damages which have accrued, or may accrue, in prosecuting the said suit or claim, with a covenant to indemnify him against the same. The costs of the suit up to this time, including those of this trial, and more than the amount thereof, were stated by the clerk to have been paid to him by Messrs. Willings; and the counsel for the plaintiffs, Messrs. Willings, offered on their behalf, to pay to the clerk any additional sum, which the defendant's counsel might require, and further, to give satisfactory security, for payment of all the costs of this suit. This deposit of the costs, was made before the jury were sworn, and the action was marked, in the clerk's docket, to be for the use of the Messrs. Willings.

It was contended, by the defendant's counsel, that the witness is still incompetent: first, on the ground of interest, and secondly, as being a party on record, in the suit in which he is to testify.

As to the first point, it was argued, that even if the witness had not signed the note to Consequa, upon which one of his suits against Willings and Francis is founded, yet as he was jointly interested in the credit, as a dormant partner with them in the loan of which the note is evidence, he is interested so to increase the damages claimed by Willings and Francis, as that thereby the claim on the note may be extinguished, or its amount diminished as much as possible. Because, if Consequa should recover the whole or any part of the note, in his present action against Willings and Francis, and not be able to obtain satisfaction from them, he might afterwards sue the witness for the money, as a dormant partner. If, on the other hand, Willings and Francis should recover damages, so as to extinguish or in part discharge this note, their release would discharge the witness from their claim for contribution.

Second. It was contended, that Mr. Kuhn, who is on record a party to the suit, cannot be a witness, and that no assignment of his interest can make him competent; not only because he still remains a party on the record, but because he is liable to the defendant, Consequa, for costs, notwithstanding the deposit which has been made. The costs of this court, cannot be ascertained, as it is impossible to say when the cause may end; and if it should go by writ of error to the supreme court, the witness will be liable to Consequa for the costs of that court, which the clerk of this court cannot ascertain. 2 Hen. & M. 467; 3 East, 7.

On the other side it was answered: First,

that the suit on the note for 22,000 dollars is brought against Willings and Francis only, and whether the plaintiff succeed or fail in his action, the judgment will be a bar to another suit against them united with the witness, and he may plead it in abatement, if he is sued alone. Second, Kuhn is a nominal party, since the assignment and deposit of the costs, and the offers which have been made, remove his interest in relation to that subject. 3 Bin. 306, 478, 481, 600; 1 Phil. Ev. 57; 2 Bay, 93.

WASHINGTON, Circuit Justice. The objections to the competency of this witness, are —first, that he is interested in the event of the suit; and secondly, that he still remains a party to the suit, notwithstanding the assignment.

First. The facts which form the basis of this objection, are as follows: Kuhn and Wharton, as supercargoes of the Asia, gave their note to Consequa, for 22,000 dollars, on which note one of these actions is brought, as upon a note given by Willings and Francis, by the procurement of their agents. The parties have agreed that these five suits should be tried by one jury, and that whatever damages shall be recovered by Willings and Francis, shall be set off against the sum due by them to Consequa, for which his two suits are brought. The argument then is, that as Kuhn is a dormant partner with Willings and Francis, in relation to the 22,000 dollars, and consequently may be hereafter liable to be sued as such for that sum, unless it should be discharged by a recovery of damages sufficient to extinguish the claims in the suits against Consequa, it is the interest of Kuhn to shelter himself against Consequa, by increasing the damages so as to discharge the note altogether, or at least to diminish its amount as much as possible.

Now there are two sufficient answers to this argument. The first is, that the interest of this witness, as stated by the defendant's counsel, is too remote and contingent to furnish an objection to his competency, whatever weight it may have to his credit. If Willings and Francis should not recover damages to extinguish this note, then a judgment must go against them, for its full amount, or for so much of it as the damages may not discharge; and if they should then be unable to satisfy that judgment, then Kuhn may be exposed to the chance of an action as a dormant partner with Willings and Francis. There are too many contingencies in the way, before Kuhn can be called upon, to make this a valid objection to his competency. But, secondly, if these contingencies should all happen, and Consequa should bring an action against Kuhn separately, he may be defeated by a plea of abatement, and the judgment in this action, for or against Consequa, would be a bar to any suit that he might bring against Willings and Francis and the witness. The judgment would as completely extinguish the original debt, as if

Willings and Francis had given a bond for it, which it would clearly have done, the rule that a bond given by a stranger, is no extinguishment of the simple contract of the real debtor, not applying to a case where it is given by one of two or more joint contractors.

But it is said, that though Consequa might have no remedy at law against Kuhn, he might be relieved in equity, by showing his ignorance that he was a dormant partner when he took the note or instituted the suit. I by no means admit that he could be relieved in that court. If the difficulty I am about to mention were out of the case, it would still depend upon a variety of circumstances, not known to this court, whether Consequa could make out a case fit for equitable interposition. By his own shewing it is certain that he did not give credit to Mr. Kuhn, and whether he knew that he was jointly concerned in that transaction or not, is unknown to this court. At all events, it was in his power to have dismissed this suit, though at the time it was brought he may have been ignorant of the partnership, and have instituted another against all the partners, after he was informed who they were; and his failing to do so, would indispose a court of equity to open its doors to him, after he had permitted those of a court of law to be closed against him. Where a release is given to one of two joint obligors, the obligation is extinguished at law as to all, and although it is most apparent that such was not the intention of the obligee, yet equity will not relieve. At all events, the liability of the witness to a claim, to be asserted by Consequa in a court of equity, is under all the circumstances of this case, too remote to affect the competency of the witness.

Secondly. It is objected, that he is a party plaintiff on the record. The general rule of law certainly is, that a party to a suit cannot be a witness. But it is equally so, that the interest which that party has in the event of the suit, both as to costs and the subject in dispute, lies at the foundation of the rule, and when that interest is removed, the objection ceases to exist. In this case, the assignment of Kuhn to Willings, has terminated his interest in the subject for which the suit is brought. As to the costs, they are paid by the assignee, now the only real plaintiff on record. But it is said Kuhn is still liable to an execution for the cost should Consequa recover; that the sum paid to the clerk, may be misapplied by him; and the quantum of costs, to this time, to future times to which this cause may continue in this court, and the costs of the supreme court, should it go there, cannot be now ascertained. To these objections it may be observed, that the clerk is a competent judge of the quantum of costs which can be recovered at this time, and the money paid to him is in the safe keeping of the court, and

subject to its disposal. Should future costs be incurred here, by another trial taking place, and this witness should then be offered, it will be time enough to inquire what further advance will be necessary. As to the costs of the supreme court upon a writ of error, which may be incurred in case such proceedings should take place, the court cannot look to such remote possibilities in order to disqualify the witness to give evidence.

It is always to be remembered that this opinion is given upon these facts: that more than the legal costs of this suit have been deposited by Mr. Willing, with the clerk; that Mr. Willing has offered to deposit any further sum which Consequa's counsel may, require, and further to give satisfactory security to pay all the costs which have, or may be incurred. If after all this, the opposite party chooses to reject offers made with a view to remove all objections, it would ill become the court to allow the mere phantom of an objection, to prevent the examination of a witness who is substantially divested of all interest. The case of Steele v. Phœnix Ins. Co., 3 Bin. 306, is in point, and I yield my entire consent to the principles there laid down. I shall not be afraid of adding another precedent, leaving it to the supreme court, where I perceive this cause is likely to go, to correct this court, if I am wrong.

A few words as to the policy of the doctrine on which this decision is founded. It is said that a plaintiff, knowing the injustice of his cause, and hopeless of success, may be induced by tempting offers to assign his interest to his co-plaintiff in order to qualify himself to be a witness, and after all, the consideration may be only feigned, and he may still continue a party in expectancy; and at all events he will testify under impressions long made and not easily to be eradicated by such an operation. All this may be true, but might not the very same reasons be urged against the competency of every witness, who has once been interested though not a party to the suit, but whose competency is restored by a release? If there be mala fides in the one case, may it not as well exist, in as strong force, in the other? May not interest make equally strong impressions in the one case, as in the other, and yet the objection come only to that of a bias in the mind, which may affect the credit of a witness, but not his competency? After all, the only safeguards in either case are, an examination of the witness on his voir dire, to test the reality and good faith of acts which rendered him disinterested, and the right which still rests with the jury to judge of his credit. The witness therefore is to be admitted.

The deposition of Mr. Miller, taken under a commission to five persons at Buenos Ayres, or to any one of them, three nominated by the plaintiffs and two by the defendants, was offered in evidence. It was objected to, because it was taken by one of the persons named in the commission, in conjunction with the American consul at that place, who certifies that all the persons named in the commission but one were dead or removed, that the commission was delivered to him, and that he convoked the remaining commissioner and the witness before him, and that the examination of the witness was taken by himself and that commissioner.

WASHINGTON, Circuit Justice. This deposition is inadmissible, because the examination was taken in conjunction with a person not named in the commission, who voluntarily and unnecessarily obtruded himself into the business. The deposition of Mr. Voute, the tea broker at Amsterdam, which was read at the former trial without objection, was now objected to on the ground of interest. This was the witness relied upon by the plaintiffs, in part, to prove the qualities of the teas of the Ganges and the Bingham, which were sold at that market by the Dutch Asiatic Company, and the prices at which those, and other teas of the best quality were sold. The evidence given in support of the objection, was a letter from Hope & Co. to the plaintiffs, dated 18th of April, 1809, inclosing the certificates of this witness as to the qualities and sales of these and other teas. In this letter the writers say, that "Mr. Voute might charge you one per cent., on the amount of the sales of these cargoes, but he is willing to receive at that rate on what you may recover on these certificates, of which you will advise us, that we may settle with him for the same." Another witness, L. Estapre, states in his deposition, that these certificates were sent to the plaintiffs on their request, made in 1807. It was contended that the witness was interested on the event of the cause, to increase as much as possible the damages which may be recovered, because that would increase his compensation. Gilb. Ev. 124; Phil. Ev. 34–57; [M'Veaugh v. Goods] 1 Dall. [1 U. S.] 62; [Innis v. Miller] 2 Dall. [2 U. S.] 50; 4 Mass. 518. It was answered, first, that no evidence was given that the offer of Voute mentioned in the above letter was accepted; second, that the compensation spoken of is one per cent., not on what the plaintiffs might recover in an action, but what they might recover on the certificates, which have not and could not have been given in evidence in this action. Besides, this witness acted as a broker at the sale of the teas referred to in his deposition, and that in that character he is not disqualified to give evidence, though his commissions are to depend on the sum to be recovered. 2 H. Bl. 590; 2 Burrows, 497; 1 Phil. Ev. 100.

WASHINGTON, Circuit Justice. I shall consider Hope & Co. as the agents of the plaintiffs, and authorised to make this contract with the witness; intending to decide this question upon the objection of interest, I shall not stop to inquire, whether the principle of law in relation to sales made by a broker, as between vendor and vendee, is or

is not applicable to a case between vendor and warrantor. If the contract then was, as the defendant's counsel have contended for, there can be no doubt but the objection would be well taken; because, if, in consideration of furnishing the certificates, the plaintiffs were to pay one per cent. on the sum to be recovered, the witness would be interested in the event of the cause, since he might in a suit against the plaintiffs, give the verdict in evidence to show how much was recovered, on which his commission was to be charged. But this was not the contract. It was to pay a commission on the amount which the plaintiffs might recover on the certificates. These certificates cannot be given in evidence in this cause, and of course nothing can be recovered upon them. It follows, that the contract is not obligatory on the parties. In an action on the contract, it would be necessary to state it specially, and aver that so much was recovered on the certificates, in which, the evidence of a recovery in this action, would be insufficient to prove the breach. There can be little doubt as to the intention of the parties, which was, that the certificates should and would be used as evidence to induce Consequa to pay without a suit, or to be used, if coercion was necessary, if by law they could be. The deposition therefore is admitted.

The same points were made by the counsel, as on the former trial, and the evidence was nearly the same, except that the correspondence between the plaintiffs and their supercargoes was not read at this trial by the counsel for Consequa, although notice had been given to the plaintiffs to produce it, they declined however to read any part of it, and of course the plaintiffs could not read it. The material parts of the evidence are stated in the charge.

WASHINGTON, Circuit Justice. As the debts claimed by Consequa, are not disputed, I shall notice only the cases in which he is defendant. These actions are founded upon verbal contracts, for breaches of which the jury are called upon to give such damages as they may think the plaintiffs justly and legally entitled to. Our enquiries are naturally directed to the following points. What are the contracts laid in the declaration? How are they proved? How have they been fulfilled? And if not fulfilled, what damages are the plaintiffs entitled to? The court has already declared, that no evidence of fraud could be given in these actions, and none has been given, and if from the evidence, the jury should be disposed to infer it, it ought not, in any shape, to influence their verdict. Gilpins v. Consequa [Case No. 5,452].

The jury are charged with three actions for damages, and these respect the cargoes of the Asia, the Bingham, and the Ganges. I shall consider them in their order.

The Asia. The contract laid in the declaration is, that the defendant agreed to furnish for this ship, a cargo of teas of the first qual-ity fitted for the Philadelphia market. This is precisely proved by Mr. Kuhn and Mr. Wharton, the supercargoes of this vessel. They state, that this contract was made in 1806, and that they were to pay for the teas, as much as other security merchants were to receive for similar teas that season. That muster chests were, according to custom, sent to their factory to examine, which they rejected; and, that after many repeated but vain attempts to make a selection, they were persuaded by the defendant to rely upon him, and that he would furnish a cargo of teas of the best quality. A cargo was accordingly put on board, without examination, which arrived at this place the following spring. A large proportion of this cargo was paid for in cash, and a credit of 16 months was given for the balance to the amount of 60,000 dollars, which credit, it was stated by the witnesses, was offered by Consequa not solicited by them.

The claim made in this action, is on account of the bad quality of 628 quarter chests of young hyson, and 309 of hyson tea. The former were examined in September, 1808, by a person acquainted with this article, who states that they were as indifferent as any teas he had ever seen, that they were worth no more than eighty-five cents per pound, at which he purchased them, but not suiting this market, he was obliged to send them to New York. He further states, that first quality teas of that denomination, were worth at the same time from one dollar ten cents to one dollar fifteen cents per pound. The 309 chests, were examined by competent judges in May, 1809; and they state, that 280 of them were inferior to fair market teas by ten cents per pound, and the remainder by five cents; and that fair market teas, are in value, fifteen per cent. below teas of the first quality. In addition to the above evidence, the acknowledgment of the defendant has been proved, made in 1807, that these teas were not so good as he agreed they should be.

The Bingham. The contract laid and fully proved as to this vessel, is, that the defendant promised to furnish a cargo of teas of the first quality, fitted for the Amsterdam market. The cargo, except 600 chests of congos, was selected by the supercargo, from samples sent to him to examine, and this selection was approved of by the defendant. This cargo was brought first to Philadelphia, and without being unladen was dispatched to Amsterdam. The evidence to prove the inferior quality of the 1,917 quarter chests, and 800 boxes of congos, for which damages are sought in this action, is derived from the deposition of Mr. Voute, the tea broker at Amsterdam, and the printed list of the sales of these teas by the Dutch Asiatic Company, compared with the sales of other teas made at the same time. The deposition states, that they were of very inferior quality and that the inferiority of price, compared with the price of other teas, is to be attributed to that

cause. It appears in evidence, that whenever the East India Company at Amsterdam, permit the importation of teas by others they are taken possession of by the officers of the company, on their arrival in the Texel. They are then conveyed in lighters to Amsterdam, and deposited in the warehouses of the company; samples of each chest are taken out by the broker, some weeks previous to the sale, for the purpose of being shown; printed lists of the teas to be sold, are issued, and by the merchants there, are distributed through the north of Europe. It is highly probable, therefore, that these sales are attended by competent judges of the qualities of this article, and that the prices given, are in a great degree apportioned to those qualities.

The Ganges. The contract laid in the declaration, as to the cargo of this ship, is the same as that of the Bingham, but the proof of it is not equally strong. The jury have not the testimony of Mr. Miller, the supercargo, and the plaintiffs are therefore obliged to resort to other evidence, in order to prove this contract. It is for the jury to judge, whether the proof is sufficient to satisfy their minds.

The first piece of evidence relied upon is that given by Mr. Wilcocks, who states, that Consequa agreed with Miller, to deliver him a cargo for this vessel of good teas; but good teas, and teas of the first quality are very different, and consequently, this proof is wholly insufficient to support the allegation of the declaration. In the next place, it is proved by Mr. Kuhn, that in 1807, he carried with him a statement made out by the plaintiffs, of their claim on account of the inferior qualities of the congo tea of the Ganges, in which Consequa was charged for the difference between the sales of those teas, at Amsterdam, and the sales of other teas of the best quality and of like denomination, made at the same time. That Consequa required a day or two for consideration, and for the purpose of consulting a friend, and he afterwards agreed to allow 19,000 dollars on account of this claim and another for cassia, sent in the same vessel. The claim for the teas and cassia amounted to about 22,000 dollars, and it does not distinctly appear, whether the deduction from that sum was made from the teas, which was stated at about 17,500 dollars, or from the cassia, or from both. If it was made from the cassia, then the inference derived from allowing the claim for the teas, as for those of the first quality, is strong, that the contract was to furnish congos of that quality; and if so, in relation to the congos, the presumption is almost inevitable, that the like contract was made as to the Campoy teas, for which this suit was brought.

It is contended by the defendant's counsel, that this settlement by Consequa, was nothing more than a concession made from motives of friendship for Messrs. Willings and Francis, and with a view to promote his own interest, not only by securing the consignment of the Asia's cargo, then in the Tigris, but their future consignments. If these were his motives, the evidence would certainly lose much of its weight; and yet they will not account for his surrendering his rights, and submitting to injustice in silence. Interest or friendship may induce a person to acquiesce in a claim which he believes to be unfounded; but in order to give value to the concession, he ought at least to appear, to the other party, sensible that he is making it. It would therefore have been perfectly natural for Consequa, to have stated to the gentleman who presented him with the statement, that the claim was not well founded, because those teas were compared with others of the best quality, whereas, he had not agreed to deliver such, because they were selected by the supercargo from samples, and because he was charged the difference between the sales of those teas, and others of the best quality, instead of making that difference, the rate of compensation applicable to the first cost. Instead of this, he made the settlement without objection, and lost of course all credit for making it. The jury will judge, under all the circumstances attending this transaction, how far this conduct of Consequa ought to be considered, as evidence of an acknowledgment made by him of a contract to deliver a cargo for this ship of teas of the first quality.

The last piece of evidence, relied upon by the plaintiffs to prove the contract as laid, is, the price paid for those teas, being that of teas of the first quality. All the witnesses have stated, that where the highest cash price is paid, it is the uniform understanding at Canton, that the best teas are to be delivered.

But it is contended by the defendant's counsel, that this proves nothing in relation to the cargo of this vessel, because a credit was allowed to Willings and Francis of 70,000 dollars; and that in a country, where the interest of money is twelve per cent., the difference must be considerable between credit and cash sales.

On the other side it is answered, that Consequa does not appear to have contemplated a difference in cases where large cash payments were made in part, because in other cases, particularly in that of the Bingham, he did not wait for a credit to be solicited, but freely offered it to any amount. Upon the whole, the jury will judge what weight there is in the circumstance of the highest price having been paid for these teas. If they should not be satisfied that the contract to deliver teas of the first quality was made, their verdict of course must be for the defendant, in the action respecting the cargo of the Ganges. If on the other hand the jury are satisfied with the proof, they will find the breach proved by the same evidence which is relied upon in respect to the cargo of the Bingham. Whether the sales at Amsterdam furnish a satisfactory criterion of quality, they must decide. If not influenced by particular circumstances, such as the state of the market,

which may produce an unnatural difference between the best and indifferent teas, or the ages of the teas, which are compared together, those sales would seem to afford as safe a test of quality as any other. Thus stand the contracts upon which these actions are brought, and the breaches of them, for which the jury are called upon to give damages.

But the defendant insists that though the jury should be satisfied that such were the contracts, originally entered into by Consequa, yet they were afterwards changed into contracts of sale by samples, and that the plaintiffs have not proved that the cargoes did not correspond with those samples, without which they cannot recover. It is not pretended that the original contracts were waived, and new contracts substituted by any express agreement; but that the usage of Canton, operating upon the acts of the supercargoes in selecting the cargoes from samples, produced this effect.

In the first place, it is to be observed, that this argument, however sound it may be in itself, is inapplicable to the cargo of the Asia, and to 600 chests of congos of the Bingham's cargo, the whole of which were received without examination. We are then to enquire, whether in relation to the other teas this usage has been proved? If it has, it must govern our decisions. The laws and usages of foreign countries where contracts are made and to be executed, which respect their validity, construction, and discharge, are regarded here as rules of decision. This usage however ought to be clearly proved; not merely because it is entirely at variance with the general principles of law, but because it is absurd and irrational. A contract of sale, may be made in various ways. It may be made without a warranty of the quality of the articles sold, in which case, if there be no fraud on the part of the seller, he is not answerable to the purchaser, although he should be disappointed; for it was his own fault if he did not examine the articles, and satisfy himself of their quality, or if he did, then it is his misfortune that his judgment deceived him. If he is unwilling to trust his own judgment, he may insist upon a warranty of the quality, in which case the vendor is bound to deliver articles of the stipulated quality, and the examination of the articles by the vendee, and his selection of such as he approves, does not amount to a waiver of the contract. If the vendee cannot examine the articles, but purchases from an examination of samples, there is an implied warranty on the part of the seller, that the articles shall correspond with the samples. But an examination of samples, like the former case, will not amount to a waiver of an express warranty that the articles shall be of a particular quality. It is true, that in both cases a selection and acceptance by the vendee, may in some instances according to the circumstances, amount to performance or to evidence of performance of the contract. But the difference in the

two cases is all important. If the original contract be waived, and a new one substituted, the vendee must prove a breach of the new contract, and consequently must prove that the articles delivered did not correspond with the samples. But if the original contract continues, and the vendee prove that the articles were not of the stipulated quality, the vendor must prove performance, by showing that the articles delivered did correspond with the samples. Neither party has or probably could prove any thing as to this matter, in the case before the jury; and the defendant, being aware of the above distinction, has insisted, that by the usage at Canton the original contract is changed into a contract of sale by samples.

The asserted usage is not only contrary to the principles of general law, but is irrational in itself. It is to be recollected, that it is in proof that the American supercargoes, as well as the East India Company, always select their teas by samples sent to them to examine. It is entirely a matter of course. Now we behold this supercargo and the Hong merchant, entering into a solemn agreement one day, by which the latter engages to furnish a cargo of teas of the first quality, which they both know at the time, is to be annulled the next day, and to be converted into a perfectly different contract. The samples are sent, not to be rejected, but to be accepted; for if the former, why send them? and if they are accepted, then the above consequence is to follow. Instead of calling this a solemn contract, it deserves the appellation of a solemn farce. What then is the proof of this usage? Cushing, Bull, and Ross, depose, that it is the usage for the Hong merchant to furnish samples for the supercargo to examine, and unless the supercargo rejects all, the Hong merchant is released from any further responsibility than that of furnishing teas according to samples chosen. Now this proves nothing to the point we are considering, because neither of these witnesses state that this is the usage in the case of a special contract to deliver teas of a particular quality; nor does it appear that this subject was in the minds of the witnesses, inasmuch as the interrogatories make no enquiries in reference to such a case. If the contract is general, or if it be in fact a sale by samples, the usage is rational, and is not at variance with our law. Mr. Hossack is very positive, that this usage is applicable to the case of a sale with a warranty of quality; so says Mr. Blight, generally; and yet, when speaking of the usage, as applicable to the East India Company, he states, that where the sales in England show the inferior quality of the teas, documents are sent to Canton stating their quality; and if they were inferior to the quality contracted for, they are charged back according to their quality; that is, if they appear to have been third instead of first quality, the Hong merchant is charged the difference between first and third quality, in reference to the prime cost. He does not

know if the samples are returned, but he has heard they are. Now, as that company always select by samples sent to their factory, and for this purpose retain in their service a skilful taster, this practice would rather seem to contradict the usage; unless it appears that samples are always returned to Canton, to be compared with the sample chests, which are always marked and retained at the factory.

But, admit that this is the usage in relation to the East India Company, is it applicable to a different trade, carried on in a different way? The two witnesses last mentioned, Mr. Hossack and Mr. Blight, confine it to that company, and state that they always mark and retain the muster chests, by which they make their selection at their factory. On the other hand, they state that the American supercargoes return the muster chests to the Hong merchant, without any mark whatever on them, and that they go, undistinguished, into the general mass of the cargo. Neither of the parties then expect that the quality of the cargo is to be tested by the sample; and does not this afford a strong reason for believing, that a usage, which depends on that test, cannot apply to a trade so circumstanced?

In support of this idea, the plaintiffs rely upon the conduct of Consequa, in the settlement of the claim for the Congo tea of the Ganges, and argue, with at least a great deal of plausibility, that as those teas were selected by samples, he would not have made that settlement if the usage had been in his favour. Upon the whole, the jury must judge if this usage is sufficiently proved. If the contracts laid in the declarations, and the breaches of them, are proved to the satisfaction of the jury, and the asserted usage is not proved, the next question for the consideration of the jury, is, what ought to be the rule for assessing the damages to which the plaintiffs are entitled?

The rule laid down in this court, in former cases, was (Gilpins v. Consequa [Case No. 5,452]) that the difference between the sales of these teas, at the foreign market, and others of the first quality, is no otherwise to be regarded, than as it furnishes a test of the quality and the rate of loss to be applied to the prime cost. But a contrary usage is attempted to be proved by the plaintiffs, and I think they have not been more successful than the defendant has been in proving the usage which has just been considered and disposed of. The evidence principally relied on to prove this usage, is the settlement made by the defendant of the loss claimed in respect to the congos of the Ganges, and his promise to settle the loss, in respect to the cargo of the Asia, which has been mentioned, and I refer the jury to the observations before made upon the weight to which this act is entitled, in the scales of evidence. Two other witnesses, Mr. Simms and Mr. Jones, have given testimony, and although they prove instances of settlements made, or give slight evidence of a usage existing different from the rule established by this court, yet the usage atempted to be proved by them,

is different from that asserted by the plaintiffs, and upon the whole, terminates in disappointment. Mr. Hossack and Mr. Blight agree on the other hand, that the usage corresponds precisely with the rule before stated. The jury will therefore govern themselves by this rule, adding of course to the sum paid for the teas, premium of insurance, duties, and other expenses which are usual, and of which they are the proper judges. As to interest, I shall leave that question to the jury upon the evidence of Mr. Hossack, who states that the usage at Canton is to add interest to the other charges.

The claim of the plaintiffs, to disallow to Consequa interest upon the debts acknowledged to be due to him, in consequence of their attachments, cannot be admitted. Where an attachment is laid in the hands of a third person, interest is stopped until it is dissolved, because the garnishee, being liable to be called upon at any moment to pay the debt, it is presumed that he had not used it. But, where a debtor who is also a creditor, lays an attachment in his own hands, there is no such necessity existing, and of course no presumption can arise that he had not used the money. If he did use it, it is but just that he should pay interest for it.

The jury brought in a verdict in favour of Consequa for the amount of his debt, with full interest; they gave damages to the plaintiffs, against Consequa, in the cases of the Bingham and Asia, allowing interest against him; and found a verdict for him, as to the cargo of the Ganges. The balance found in favour of Consequa amounted to about 71,000 dollars. A compromise was afterwards made, in which Consequa allowed a compensation for the cargo of the Ganges, and these cases were finally adjusted.